## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PAUL D. RUSSELL,

                              **Plaintiff**,

v.                                                          Case No. 22-4035-DDC

CHRISTINE E. WORMUTH,
Secretary of the Army,

                              **Defendant**.

## MEMORANDUM AND ORDER

This case requires the court to resolve two questions: Where does the buck stop? And was it bad enough? *To start*, there's the buck. Plaintiff Paul D. Russell alleges that he experienced a hostile work environment and that his employer, the Army, is liable for it. Defendant, Christine E. Wormuth in her official capacity as Secretary of the Army, contends that the Army escapes liability under the *Faragher/Ellerth* affirmative defense. According to that defense, an employer can escape liability for a supervisor's conduct if the employer shows, *first*, its own preventive and corrective action and, *second*, plaintiff's unreasonable inaction. At summary judgment, the employer successfully escapes liability under this defense when no reasonable jury could find it failed to show either of those two prongs. Were defendant here to succeed on this affirmative defense, then the buck doesn't stop with the Army.

*Next*, there's the bad. Plaintiff alleges his direct supervisor, Major (MAJ) Tamara Tran, discriminated against him based on gender, violating Title VII. Defendant contends that plaintiff hasn't adduced evidence to support a reasonable finding that he experienced harassment based

on his sex.  And even if he did, defendant asserts, he hasn't shown that the harassment was sufficiently severe or pervasive to support a hostile work environment claim.  In a nutshell, defendant argues summary judgment is appropriate because MAJ Tran's conduct just wasn't bad enough.  Plaintiff survives summary judgment if a reasonable jury could find that plaintiff experienced harassment based on sex that was either sufficiently severe or sufficiently pervasive to support a hostile work environment claim.

The court denies summary judgment for defendant on the buck-stopping defense—the *Faragher/Ellerth* affirmative defense.  Defendant's brief presents this argument as predominate—arguing it first.  So, the court gives it full consideration, addressing each prong in detail.  In the end, though, defendant's primary argument can't carry the day.  A reasonable jury could find that defendant failed to establish the second prong, plaintiff's inaction.  That conclusion aside, the court nonetheless grants summary judgment in defendant's favor, but based on defendant's alternative, secondary argument—the bad.  Under binding Tenth Circuit precedent, a reasonable jury couldn't find that the harassment plaintiff experienced was either sufficiently severe or sufficiently pervasive to support a hostile work environment claim.  The court explains its decisions, below.

## I.    Background

The following facts are stipulated, uncontroverted, or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### Plaintiff's Temporary Position & Transition to New Chief

Plaintiff began working at Irwin Army Community Hospital (IACH), in Fort Riley, Kansas, in November 2010.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.i.).  In May 2017, he received a temporary promotion to Chief of the Logistics Division.  *Id.* (Pretrial Order ¶ 2.a.ii.).  He

remained temporary Chief until his replacement, MAJ Tamara Tran, officially assumed the same position on November 11, 2018. *Id.* (Pretrial Order ¶ 2.a.iii.). MAJ Tran arrived a few months before assuming her position—in August 2018—to facilitate a transition period. *Id.*; Doc. 54-2 at 4 (Russell Dep. 16:1–9). When MAJ Tran became Chief, plaintiff reverted back to his former position as "Medical Logistics Readiness Manager." Doc. 54-4 (Def. Ex. 2). Colonel (COL) Donald Sexton[1] served as the direct supervisor for the Chief, and the second-line supervisor for the Readiness Manager.[2] Doc. 61-5 at 2–3 (First Sexton Decl.). COL Sexton informed plaintiff that his position would revert back to Readiness Manager on November 9, 2018. Doc. 54-4 (Def. Ex. 2). Plaintiff then emailed MAJ Tran, providing a slide deck to aid in her transition to the Chief position and offering his assistance. Doc. 54-6 at 1–2 (Def. Ex. 3). MAJ Tran responded, stating she would "enlist [his] assistance when necessary." *Id.* at 1. Plaintiff contends that during the transition period, MAJ Tran communicated with him primarily through COL Sexton as an intermediary, rather than directly. Doc. 54-2 at 51–52 (Russell Dep. 102:19–103:19). And plaintiff didn't understand why MAJ Tran didn't ask him more questions. *Id.* (Russell Dep. 102:19–103:6).

### *MAJ Tran's Segregated Meetings & Readings*

As part of her transition to Chief, MAJ Tran scheduled numerous meetings with various groups in the Logistics Division. *Id.* at 28–29 (Russell Dep. 68:23–69:7). MAJ Tran segregated some of these transition meetings by gender. Doc. 61-5 at 3 (First Sexton Decl.). In early

---

[1]    At the time of the events at issue, Mr. Sexton was a Lieutenant Colonel (LTC). Doc. 61-5 at 2 (First Sexton Decl.). And the Pretrial Order identifies him as such. Doc. 52 at 2 (Pretrial Order ¶ 2.a.v.). But he since has received a promotion to Colonel (COL). Doc. 54 at 3 n.2. To recognize his current rank, this Order refers to Mr. Sexton as COL Sexton throughout.

[2]    In other words, the hierarchy from lower position to higher position read this way: Readiness Manager (plaintiff) → Chief of Logistics (MAJ Tran) → Deputy Commander of Administration (COL Sexton). Doc. 61-5 at 2–3 (First Sexton Decl.).

3

November, plaintiff attended two transition meetings—one for supervisors and one for men only. Doc. 54-2 at 27 (Russell Dep. 67:19–68:1). MAJ Tran also scheduled a meeting for women only on the same day. *Id.* at 28–29 (Russell Dep. 68:24–69:7). Plaintiff contends that holding separate meetings—segregated by gender—wasn't a common practice and that it was frowned upon. *Id.* at 35 (Russell Dep. 79:1–9). Plaintiff also recalls that MAJ Tran, during the supervisory meeting, commented on how she couldn't believe there were no other women in supervisory positions. *Id.* at 29 (Russell Dep. 69:12–24). MAJ Tran made a similar comment during the men only meeting. *Id.* at 33 (Russell Dep. 74:3–12); Doc. 54-13 at 2 (Second Sexton Decl. ¶ 11). Other attendees took offense and openly responded to MAJ Tran's comments. Doc. 54-2 at 33 (Russell Dep. 74:3–12). But plaintiff didn't respond at the time because he was "just in shock." *Id.* Apart from MAJ Tran, no woman occupied a supervisory position at that time. *Id.* at 29 (Russell Dep. 69:12–24).

MAJ Tran also assigned gender-specific readings to discuss at the meetings. Doc. 54-13 at 2 (Second Sexton Decl. ¶ 11). She discussed "Lean In: Women, Work and the Will to Lead" with the women, a book emphasizing "female empowerment." *Id.* And with the men she discussed a book on leadership by Secretary Colin Powell. *Id.* COL Sexton later confronted MAJ Tran about the segregated meetings and separate book assignments. Doc. 61-5 at 4 (First Sexton Decl.). MAJ Tran "felt she was addressing the perceived (gender) problems within the department." *Id.*

### *MAJ Tran's Allegedly Disparaging Statements[3]*

---

[3] Defendant's brief identifies these statements as "Hearsay Comments by MAJ Tran." Doc. 54 at 5. But defendant never objected explicitly to these statements as hearsay in the Pretrial Order. *See generally* Doc. 52. Nor did defendant's summary judgment brief otherwise argue that the court should exclude these statements from summary judgment, apart from the singular use of the word "Hearsay" noted here. But the court takes up the hearsay question before considering these facts at summary judgment nonetheless, out of an abundance of caution. If these statements are hearsay, the court

At her transition Army leadership management meetings, MAJ Tran allegedly criticized plaintiff and made disparaging comments about "how he managed the division" as acting Chief. Doc. 54-2 at 41–42 (Russell Dep. 91:18–92:17); Doc. 54-13 at 2 (Second Sexton Decl. ¶ 8). She also allegedly voiced her disapproval of plaintiff's decisions as acting Chief in front of other Logistics employees, at least once. *Id.* (Second Sexton Decl. ¶ 15). In response, COL Sexton counseled MAJ Tran to make any such complaints in private. *Id.* (Second Sexton Decl. ¶ 16). He also warned her about "violating policy and creating a division amongst the staff." Doc. 61-5 at 3–4 (First Sexton Decl.). Plaintiff learned about MAJ Tran's comments through third parties. Doc. 54-2 at 42–43 (Russell Dep. 92:18–93:8). Plaintiff identified these comments as "disparaging [his] professionalism" and viewed them as "ridicule," "insult or offensive comments." *Id.* at 57 (Russell Dep. 111:5–12).

### *Scheduled Appointments to Meet with MAJ Tran*

Plaintiff also alleges that, during the transition, MAJ Tran allowed female employees unfettered access to speak with her in her office. Doc. 54-2 at 36 (Russell Dep. 86:16–22). When it came to male employees, however, MAJ Tran required them to schedule an appointment. *Id.* For example, MAJ Tran refused an open-door meeting with plaintiff a "couple times" after a "group huddle in the morning" when plaintiff sought clarity about something she assigned him during the meeting. *Id.* at 38, 40 (Russell Dep. 88:9–12, 90:1–10). Instead of

---

shouldn't consider them at summary judgment unless "the Court determines that the evidence will be presented in an admissible form" at trial. *Bell v. City of Tulsa*, No. CIV 21-0061 JB/CDL, 2024 WL 1018528, at *11 n.57 (N.D. Okla. Mar. 8, 2024) (collecting authorities).

But here, plaintiff doesn't offer these statements to prove he performed poorly in his role as acting Chief—the matter asserted. Instead, he offers them to prove their effect on the listener—hearing these statements allegedly altered the work environment for plaintiff. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993) (recognizing that statements offered for their effect on the listener are not generally hearsay). Thus, the statements aren't hearsay and Fed. R. Evid. 802 does not bar their admission. So, the court can consider these facts at summary judgment.

discussing the assignment at the time, MAJ Tran told plaintiff that they were "going to have to schedule a meeting[.]"  *Id.* at 40 (Russell Dep. 90:1–10).  After two or three such experiences, plaintiff stopped trying to ask questions in that fashion.  *Id.* at 40, 41 (Russell Dep. 90:13–19, 91:4–6).  Plaintiff also recounts times when MAJ Tran began a conversation with him from her office—informally.  *Id.* at 38–39 (Russell Dep. 88:19–89:21).  In these situations, plaintiff  came into her office, and the two completed the conversation at that time, without scheduling a formal appointment.  *Id.* at 38–39 (Russell Dep. 88:19–89:21).

### *Change in Title*

On November 27, 2018, MAJ Tran asked plaintiff to update his title to "Readiness Manager."  Doc. 52 at 2 (Pretrial Order ¶ 2.a.iv.).  Plaintiff's email signature up to that point identified his position as "Chief of Logistics Readiness."  Doc. 54-9 (Def. Ex. 9).  Plaintiff contends the Logistics Division's Table of Distribution Allowances (TDA) identified his position as "C, Readiness Manager"—with the "C" presumably short for Chief—and, that the change in title thus wasn't proper.  Doc. 61-3 at 9 (Russell Decl. ¶ 35r).  MAJ Tran's email requesting the change suggests dropping the "Chief" designation accorded with the TDA.  Doc. 54-9 (Def. Ex. 9).  The Army's Position Description for plaintiff's job used the title "Medical Logistics Readiness Manager for Irwin Army Community Hospital[.]"  Doc. 54-11 at 3 (Def. Ex. 13).  The Logistics Division organizational chart lists plaintiff's title as "Readiness Manager."  Doc. 54-7 at 1 (Def. Ex. 12).  And the IACH personnel roster lists plaintiff's position as "Readiness Mgmt."  Doc. 54-8 at 1 (Def. Ex. 10).

### *MAJ Tran's Emails*

Plaintiff also alleges two other MAJ Tran emails support his hostile work environment claim.

Email #1:  On December 7, 2018, MAJ Tran sent an email to plaintiff about an unpaid invoice for a door company.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.vi.).  MAJ Tran asked plaintiff to close out the invoice because it had occurred during the time plaintiff was acting Chief.  *Id.*  MAJ Tran carbon copied four other employees on the email.  Doc. 54-12 at 2 (Def. Ex. 15).  The email assumed the door repair was for IACH:  "I am not sure which door repair for IACH this is but she wanted to collect payment."  *Id.*  Plaintiff then explained to MAJ Tran that the invoice wasn't a work-related matter.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.vii.).  And MAJ Tran responded, "Awesome.  The lady on the phone did not differentiate.  Thanks for the quick reply."  *Id.*

Email #2:  On March 18, 2019, MAJ Tran sent an email asking individuals in the Resource Management division to remove plaintiff from leadership emails.  *Id.* (Pretrial Order 2.a.viii.).  To explain her request, MAJ Tran wrote:  "[H]e is our Readiness Manager, not the deputy."  Doc. 54-14 (Def. Ex. 14).  Plaintiff testified that this request "was significantly different from the past, the previous years of how the division operated."  Doc. 54-2 at 26–27 (Russell Dep. 66:21–67:1).  Plaintiff wasn't aware of MAJ Tran removing any other male employees from the leadership emails or adding any female employees.  *Id.* at 27 (Russell Dep. 67:2–7).

### *Appointment of Maternity Leave Interim Chief*

MAJ Tran identified a female employee to fill in for her position while she was on maternity leave.  Doc. 54-13 at 4 (Second Sexton Decl. ¶ 28).  The woman she identified was the same grade as plaintiff.  Doc. 54-2 at 50 (Russell Dep. 101:3–9).  Because the replacement was not a supervisor and, instead, was a civilian employee, COL Sexton told MAJ Tran to choose someone else—an existing supervisor.  Doc. 54-13 at 4 (Second Sexton Decl. ¶ 29); Doc. 61-5 at 10 (First Sexton Decl.).  Plaintiff believed that he should serve as the deputy chief in MAJ Tran's absence, per his position description.  Doc. 54-2 at 50 (Russell Dep. 101:10–14).  MAJ Tran and

COL Sexton selected a male military supervisor to fill in while she was on maternity leave.  Doc. 54-13 at 4 (Second Sexton Decl. ¶ 30).

### *EEO Sensing Session[4]*

COL Sexton reached out to Kathy Bellinder, an EEO officer, on November 27, 2018, to discuss his concerns based on plaintiff's complaints, his conversation with MAJ Tran about the gender-segregated meetings, and his own observations.  *Id.* (Second Sexton Decl. ¶ 32); Doc. 61-5 at 4 (First Sexton Decl.).  Ms. Bellinder's position required that she review, analyze, and evaluate EEO program initiatives and oversee and monitor the EEO complaints processing system, among other things.  Doc. 54-15 at 1 (Bellinder Decl. ¶ 1).

COL Sexton and Ms. Bellinder also discussed conducting a sensing session within the Logistics Division.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.v.).  Deciding to move forward with the session, Ms. Bellinder drafted an EEO sensing questionnaire.  Doc. 54-15 at 5 (Bellinder Decl. ¶¶ 30–31).  In late January, they held individual sensing session interviews for every Logistics employee.  *Id.* (Bellinder Decl. ¶ 32).  In these open-ended interviews, employees could share anything they "may think is necessary to bring up."  Doc. 54-2 at 75 (Russell Dep. 145:3–23).  Plaintiff participated in these sessions.  *Id.* at 75–76 (Russell Dep. 145:19–146:4).  And he brought up "the separate meetings by gender, the separate book professional reading[s], nonsupervisors in supervisory meetings" and "general communication challenges. . . across the Logistics."  *Id.* at 76–77 (Russell Dep. 146:17–147:14).  Three individuals made complaints

---

[4]     The parties don't define the meaning of this phrase, though an earlier case in our district described it this way:  "A sensing session is a meeting in which employees are encouraged to speak freely about any issue or concern they may have about their work environment."  *Gaskins v. Dep't of the Army ex rel. McHugh*, No. 10-CV-4076, 2012 WL 3245455, at *1 n.1 (D. Kan. Aug. 9, 2012).  This meaning comports with the context in which the parties use the term here.

about MAJ Tran.  Doc. 54-15 at 5 (Bellinder Decl. ¶ 33).  "Numerous individuals made

complaints about [p]laintiff during the sensing session," as well.  *Id.* (Bellinder Decl. ¶ 34).

### *AR 15-6 Internal Investigation*[5]

After the sensing session, COL Sexton ordered an AR 15-6 investigation into the

allegations of misconduct by both plaintiff and MAJ Tran.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.ix.).

Plaintiff and MAJ Tran both were detailed out of the Logistics division throughout the

investigation.  *Id.* (Pretrial Order ¶ 2.a.x.).  Defendant reassigned plaintiff to "Quality & Safety."

Doc. 54-2 at 80 (Russell Dep. 163:13–17).  Plaintiff's new detail was temporary.  Doc. 54-24

(Def. Ex. 27) (notifying plaintiff of "temporary detail" to Department of Quality and Safety);

Doc. 54-25 (Def. Ex. 28) (notifying plaintiff of extension of that "temporary detail").  Plaintiff's

new duties in the Quality & Safety Department didn't change his pay, benefits, or compensation.

Doc. 54-2 at 81 (Russell Dep. 165:9–18).

### *Defendant's Anti-Harassment Training*

All IACH employees completed yearly anti-harassment training and No FEAR Act

training.  Doc. 52 at 2 (Pretrial Order 2.a.xi.).  Annual trainings were mandatory for all

employees.  Doc. 54-15 at 4 (Bellinder Decl. ¶ 18). They provided information about equal

employment opportunity, prohibited personnel practices, and whistleblower protection laws.

Doc. 54-21 at 1–2 (Def. Ex. 18).  The trainings also specifically addressed sex discrimination,

Doc. 54-22 at 36–38 (Def. Ex. 19), and workplace harassment, complete with multiple scenarios

demonstrating what constitutes harassment, Doc. 54-21 at 23, 27–29 (Def. Ex. 18).  The trainings

---

[5]    Army Regulation 15-6 is "a general regulation outlining procedures to be followed by boards of
officers who are conducting investigations involving individual members of the Army."  *Vaughan v.
Kentucky Army Nat. Guard*, No. CIV.A. 3:12-35-DCR, 2013 WL 211075, at *4 (E.D. Ky. Jan. 18, 2013).
"AR 15–6 sets out an informal investigation process and provides a fact-gathering tool for Army
commanders."  *Id.* (quotation cleaned up).

instructed employees subjected to harassment to "promptly report" concerns through the "chain of command or a supervisor to whom [the employee] feel[s] comfortable reporting" so that "command can investigate and take steps to end the harassment." *Id.* at 26 (Def. Ex. 18); Doc. 54-22 at 34 (Def. Ex. 19). Finally, these trainings informed employees that they could contact their "servicing EEO office to file a complaint within 45 days" of harassment awareness. Doc. 54-21 at 26 (Def. Ex. 18); Doc. 54-22 at 34 (Def. Ex. 19). Plaintiff completed both these trainings in the years 2016, 2017, 2018, and 2019. Doc. 54-2 at 61–62 (Russell Dep. 125:19–126:14); Doc. 54-23 at 1–2 (Def. Ex. 21) (recording completion dates of plaintiff's online anti-harassment training for listed years).

Also, the IACH Commander adopted an anti-harassment policy. Doc. 54-18 (Def. Ex. 20). The policy defined and condemned workplace harassment. *Id.* at 1. It informed employees of their responsibility to report concerns "without delay through their supervisory chain of command and/or the EEO Office" and identified the location and phone number of the EEO office. *Id.* at 2. Defendant provided employees with the EEO complaint procedure. Doc. 54-15 at 4 (Bellinder Decl. ¶ 20). Per the Army's complaint procedure, it investigated any reported complaint of harassment. *Id.* at 3–4 (Bellinder Decl. ¶¶ 16–17).

### Plaintiff's EEO Complaint

Plaintiff made initial contact with the EEO office on April 11, 2019. Doc. 52 at 3 (Pretrial Order ¶ 2.a.xii.). Plaintiff then filed his EEO complaint about one month later, on May 13, 2019. *Id.* (Pretrial Order ¶ 2.a.xiii.).

## II.    Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence

and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified

by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."

*Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth

facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022)

(quotation cleaned up).

Finally, since 1986, federal courts haven't viewed summary judgment as a "disfavored

procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure

"designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*

(quoting Fed. R. Civ. P. 1).

## III.       Employer Liability for Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for

an employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment because of such individual's race, color, religion, sex, or

national origin[.]" 42 U.S.C. § 2000e-2(a)(1). In addition to prohibiting "discrimination with

respect to employment decisions that have direct economic consequences," Title VII also

"prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421,

426–27 (2013). In such cases, "the plaintiff must show that the work environment was so

pervaded by discrimination that the terms and conditions of employment were altered." *Id.* at

427 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Assuming a plaintiff proves

such pervasive discrimination, an employer may face liability. *Kramer v. Wasatch Cnty.*

*Sheriff's Off.*, 743 F.3d 726, 737 (10th Cir. 2014). An "employer is subject to vicarious liability

for actionable sexual harassment perpetrated by a supervisor . . . in two situations." *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011).

*One*, an employer is subject to strict vicarious liability "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment[.]" *Id.* (quotation cleaned up).  Because an employer in this first scenario is strictly liable, it can't assert an affirmative defense.  *Id.*  But, when "a supervisor's harassment of a subordinate does not culminate in a tangible employment action . . . it is 'less obvious' that the agency relation is the driving force." *Penn. State Police v. Suders*, 542 U.S. 129, 145 (2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)).  And so, an affirmative defense becomes available to the employer.  *Id.* at 145–46.

*Two*, absent a tangible employment action, the employer nonetheless remains liable "'unless it can prove an affirmative defense by a preponderance of the evidence.'" *Helm*, 656 F.3d at 1285 (first citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); and then citing *Ellerth*, 524 U.S. at 765).  Commonly referred to as the *Faragher/Ellerth* affirmative defense, an employer can overcome liability if it proves two things—one about its own actions and one about the plaintiff-employee's inaction.  *Id.*  The employer first must prove that it "'exercised reasonable care to prevent and correct promptly any sexually harassing behavior[.]'" *Id.* (first quoting *Faragher*, 524 U.S. at 807; and then quoting *Ellerth*, 524 U.S. at 765).  And then, separately, it must prove that the plaintiff-employee "'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (first quoting *Faragher*, 524 U.S. at 807; and then quoting *Ellerth*, 524 U.S. at 765).

### A.    Supervisory Authority

Many cases begin a Title VII employer liability analysis by deciding this threshold question:  did the alleged harasser qualify as a supervisor?  *See, e.g.*, *Kramer*, 743 F.3d at 737–43 (conducting extended analysis whether alleged harasser had "power to recommend and influence tangible employment actions"); *Isberner v. Walmart Inc.*, No. 20-2001-JAR-KGG, 2021 WL 4284540, at *21 (D. Kan. Sept. 21, 2021) (concluding supervisory authority inhered where alleged harasser possessed power to discipline plaintiff-employee, weighed in on tangible employment actions, and contributed to performance evaluations affecting plaintiff-employee's pay).  And this approach makes sense.  The Supreme Court has identified that, under Title VII, "an employer's liability for [workplace] harassment may depend on the status of the harasser." *Vance*, 570 U.S. at 424.  When the harasser qualifies as a co-worker instead of a supervisor, "the employer is liable only if it was negligent in controlling working conditions."  *Id.*  That is, the harassment of the co-worker wasn't "made possible by abuse of supervisory power[,]" *Helm*, 656 F.3d at 1285, and so different rules apply, *see Penn. State Police*, 542 U.S. at 143 n.6 ("*Ellerth* and *Faragher* expressed no view on the employer liability standard for co-worker harassment."); *Vance*, 570 U.S. at 439 ("Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.").

The Supreme Court has defined the word supervisor—for the purposes of vicarious liability under Title VII—to include one who "is empowered by the employer to take tangible employment actions against the victim[.]"  *Vance*, 570 U.S. at 424.  A tangible employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Id.* at 429 (quoting *Ellerth*, 524 U.S. at 761).  And where a "harasser is

empowered to effect significant changes in employment status indirectly through recommendations, performance evaluations, and the like, . . . the harasser may be a 'supervisor' under Title VII." *Kramer*, 743 F.3d at 741.

The court resolves the supervisor question here first, recognizing it as a significant threshold matter. In so doing, the court doesn't consider whether MAJ Tran took tangible employment actions—that analysis comes later—but instead whether she possessed that power.

Here, the summary judgment evidence shows MAJ Tran functioned as plaintiff's direct supervisor—and the parties don't dispute this role. *See generally* Doc. 54; Doc. 61. Plaintiff declared—in conjunction with the internal investigation (and under penalty of perjury)—that MAJ Tran was his "immediate (1st line) supervisor." Doc. 61-3 at 3 (Pl. Ex. C). And he testified in his deposition that MAJ Tran was his "direct supervisor." Doc. 54-2 at 52 (Russell Dep. 103:3). The Logistics Division organizational chart (shown below) also shows that MAJ Tran's position—Chief of the Logistics Division—was a level directly above plaintiff's Readiness Management post in the division's hierarchy.



Doc. 54-7 at 1 (Def. Ex. 12) (red outline added by the court). Finally, the Army's Position Description specifies that the Readiness Manager "works under the supervision of the Chief of Logistics Division." Doc. 54-11 at 3 (Def. Ex. 13). The record doesn't identify what the Chief's

supervision entails. But it does include a section on "Supervision" by the Readiness Manager over his subordinates, which sheds light on supervisory authority in the Logistics division context. *Id.* at 4–5 (Def. Ex. 13). For a Readiness Manager, supervision includes: "[i]nterview[ing] and mak[ing] selection for subordinate position" and "prepar[ing] formal evaluations." *Id.* at 5. A Readiness Manager, as a lower-level employee imbued with supervisory authority, thus possessed tangible employment action power as defined by *Vance* and *Kramer*—specifically, hiring and performance evaluations. *Vance*, 570 U.S. at 429; *Kramer*, 743 F.3d at 741. A reasonable jury evaluating this evidence could conclude that MAJ Tran—a higher-level employee with clear supervisory authority—had the power to execute a tangible employment action against plaintiff.

So, because plaintiff has adduced admissible evidence enabling a finding that MAJ Tran had tangible employment action power, the next question asks, did she use it against plaintiff? If so, strict vicarious liability for the defendant may follow.

### B.    Strict Vicarious Liability for Tangible Employment Actions

Strict vicarious liability inheres when a supervisor's harassment culminates in a tangible employment action. *Helm*, 656 F.3d at 1285. "Tangible employment actions fall within the special province of the supervisor, who has been empowered by the company as an agent to make economic decisions affecting other employees under his or her control." *Penn. State Police*, 542 U.S. at 144 (quotation cleaned up). That is, a tangible employment action "is 'the means by which the supervisor brings the official power of the enterprise to bear on subordinates.'" *Id.* (quoting *Ellerth*, 524 U.S. at 762). "A tangible employment decision requires an official act of the enterprise, a company act." *Vance*, 570 U.S. at 429 (quoting *Ellerth*, 524 U.S. at 762). Recall that a "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits" and

"in most cases inflicts direct economic harm."[6]  *Ellerth*, 524 U.S. at 761–62.  If "a co-worker

---

[6]      Plaintiff's Response invokes recent Supreme Court precedent, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).  Doc. 61 at 14.  And that response implies—though without any explanation or specificity—that *Muldrow* should influence the court's analysis here.

        *Muldrow* decided a Title VII discrete discrimination claim premised on job transfer.  601 U.S. at 354.  The Court held that a plaintiff asserting a Title VII discrimination claim "must show some harm respecting an identifiable term or condition of employment" but not "significant" harm.  *Id.* at 354–55.  The Tenth Circuit hasn't addressed the breadth of *Muldrow*'s reach.

        Some Circuits have acknowledged that *Muldrow* may affect the adverse employment action analysis more generally—that is, beyond the job transfer context.  *See, e.g.*, *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885–86 (6th Cir. 2024) (acknowledging *Muldrow* may call the Sixth Circuit's precedent "into doubt" but saving "*Muldrow*'s effect on our caselaw for another day").  Our court and other district courts in our Circuit have applied *Muldrow* more broadly, consulting its lenient standard when analyzing an adverse employment action outside the job transfer context.  *See Harris v. Sec'y of U.S. Dep't of Veterans Affs.*, No. 22-CV-02489-HLT, 2024 WL 3010879, at *10 (D. Kan. June 14, 2024) ("No reasonable jury could conclude that the alleged multiple investigations were an adverse employment action, even under the more lenient standard of *Muldrow*."); *see also Smith v. McDonough*, No. CV 20-1321 KK/JFR, 2024 WL 2804428, at *8–10 (D.N.M. May 31, 2024) (completing a sua sponte review of a previous Order's ruling on disparate treatment claims not involving a job transfer to account for *Muldrow*'s new standard).  But plaintiff here appears to suggest *Muldrow*'s reach should extend even further—altering either the tangible employment action analysis or the severe and pervasive analysis for a hostile work environment claim.  *See* Doc. 61 at 14.  Plaintiff's papers don't clarify which analysis *Muldrow* allegedly affects.  *See id.*  The court isn't persuaded that *Muldrow* alters either analysis.  And neither are other courts.

        The Sixth Circuit, for example, addressed *Muldrow* in the disparate treatment discrimination claim context, and then—in the same opinion—ignored *Muldrow* in the hostile work environment claim context.  *See, e.g.*, *Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *5, 7–8 (6th Cir. July 16, 2024) (evaluating adverse employment actions under the "*Muldrow* standard" but not employing that standard when evaluating hostile work environment claim).  And another court expressly has concluded that *Muldrow* doesn't alter the hostile work environment analysis.  *Zuniga v. City of Dallas*, No. 23-CV-2308-D, 2024 WL 2734956, at *3 n.3 (N.D. Tex. May 28, 2024) ("The Supreme Court has defined the requirements of a hostile work environment claim over the course of many years, making clear the high bar that plaintiffs must meet to make out this claim. There is no suggestion in *Muldrow* that the Supreme Court intended to alter these requirements." (internal citation omitted)).  And this treatment makes sense.

        The Supreme Court has clarified that vicarious employer liability rests on agency principles.  *Penn. State Police*, 542 U.S. at 144.  For example, the agency relationship manifests when "the supervisor brings the official power of the enterprise to bear on subordinates" and any tangible employment decision "is documented in official company records . . . subject to review by higher level supervisors."  *Id.* at 144–45 (quotation cleaned up).  The official power and documentation required to invoke these agency principles suggests a level of formality corresponding with a "'significant change in employment.'"  *Id.* at 144 (quoting *Ellerth*, 524 U.S. at 761).  And so, it's appropriate that a tangible employment action in the

could have inflicted the same harm as easily . . . then the harm is not a tangible employment action." *Kramer*, 743 F.3d at 739.

Here, plaintiff alleges that MAJ Tran engaged in the following actions:  She (1) conducted separate meetings for male and female employees; (2) assigned separate readings based on gender; (3) commented on the absence of female supervisors; (4) permitted spontaneous meetings with female employees but required male employees to make an appointment; (5) designated a woman as acting Chief when MAJ Tran went on maternity leave (but ultimately appointed a man); (6) communicated insufficiently with plaintiff during the transition period; (7) required plaintiff to remove the "Chief" designation from his Readiness Manager title; (8) allegedly commented disparagingly about plaintiff's incompetent and illegal decisions as acting Chief; (9) sent multiple recipients email about door repair; and (10) had plaintiff removed from leadership emails.[7]  Doc. 52 at 4–7 (Pretrial Order ¶ 3.a.).

---

hostile work environment context includes significant actions like "'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Id.* at 144 (quoting *Ellerth*, 524 U.S. at 761).  That is, just as the *Muldrow* Court explicitly refused to extend its lenient standard to the retaliation context because of "reasons peculiar" to that context, 601 U.S. at 357, reasons peculiar to agency principles likewise counsel against extending *Muldrow*'s standard to the hostile work environment context at issue here.

[7]      Plaintiff also makes two other allegations not listed here.

  *One*, plaintiff alleges that he "was forced to resign in order that he might resume his career as a Logistics Chief elsewhere."  Doc. 52 at 7 (Pretrial Order ¶ 3.a.).  But the court already has dismissed any constructive discharge or retaliation claim as not exhausted.  Doc. 27 at 8–11.  And the court's Pretrial Order reiterated that dismissal.  Doc. 52 at 7 n.1 (Pretrial Order ¶ 3.a.).  What's more, even if the court considered constructive discharge in the tangible employment action analysis, it still wouldn't qualify.

  To be sure, a plaintiff's decision to quit his job can qualify as a tangible employment action— subjecting the employer to strict liability—in some situations.  *See Penn. State Police*, 542 U.S. at 134.  That's the case when "the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing [his] employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which [he] would face unbearable working conditions."  *Id.*  "But when an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis . . . calls for extension of the affirmative defense to the employer."  *Id.* at 148.  An official act includes those "reflected in company records—a demotion or a reduction in compensation, for example[.]"  *Id.*  "Absent

Plaintiff concedes that much of MAJ Tran's conduct—including actions (5), (9), and (10)—didn't amount to (or produce) tangible employment actions.  *See* Doc. 54-2 at 51 (Russell Dep. 102:7–18) (conceding no immediate adverse employment action resulted from MAJ Tran appointing other male employee her temporary replacement during maternity leave); *id.* at 48 (Russell Dep. 99:3–19) (conceding no adverse employment action resulted from MAJ Tran sending door repair email to multiple people); *id.* at 27 (Russell Dep. 67:2–12) (conceding no adverse employment action resulted from MAJ Tran removing plaintiff from leadership emails); and *id.* at 32 (Russell Dep. 73:4–13) (conceding no adverse employment action resulted from attendance of female non-supervisory employees at the supervisor's meeting).  What's more, all save one of the remaining allegations don't align with tangible employment actions.  That's because these remaining allegations didn't involve MAJ Tran bringing "the official power of the enterprise to bear on subordinates."  *Penn. State Police*, 542 U.S. at 144 (quotation cleaned up).

---

such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation . . . is less certain."  *Id.* at 148–49.  And "[t]hat uncertainty . . . justifies according the employer the chance to establish, through the *Ellerth/Faragher* affirmative defense, that it should not be held vicariously liable."  *Id.* at 149.

Here, plaintiff never alleges that MAJ Tran officially changed his employment status by "a humiliating demotion, extreme cut in pay, or transfer[.]"  *Id.* at 134.  In fact, MAJ Tran never changed plaintiff's employment status at all.  Plaintiff's only change in position—which was temporary—came through the AR 15-6 investigation.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.x.).  And so, MAJ Tran wasn't aided by the agency relationship in ever changing plaintiff's employment status.  As such, constructive discharge as a tangible employment action can't preclude defendant's assertion of the *Faragher/Ellerth* affirmative defense.

*Two*, plaintiff alleges that his position after the investigation didn't include previously held supervisory duties.  Doc. 52 at 7 (Pretrial Order ¶ 3.a.).  But the summary judgment facts indicate that plaintiff's Readiness Manager position description (PD) didn't change.  Doc. 54-2 at 14 (Russell Dep. 32:10–11).  And plaintiff doesn't contest defendant's statement of fact outlining this non-change.  Doc. 54 at 14 (SOF ¶ 94); Doc. 61 at 9 ("Plaintiff ADMITS ¶¶ 84–96 of Defendant's Factual Statement.").  And so, even construing all the summary judgment facts in plaintiff's favor, no summary judgment facts can support this allegation.  The court, thus, doesn't consider this allegation in its analysis.  *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) ("Courts do not assume as true allegations that are legal conclusions, formulaic recitations of elements, or naked assertions devoid of further factual enhancement.").

As an example, plaintiff alleges that MAJ Tran held gender-segregated meetings where she assigned gender-segregated readings—actions (1) and (2). Doc. 52 at 4–5 (Pretrial Order ¶ 3.a.). But these meetings didn't change plaintiff's "employment status," or benefits, or "inflict[] direct economic harm" on plaintiff. *Ellerth*, 524 U.S. at 761–62. Then, plaintiff lodges two complaints about MAJ Tran's communication with him—actions (4) and (6). *First*, he alleges that MAJ Tran didn't communicate sufficiently with him during the transition period. Doc. 52 at 4 (Pretrial Order ¶ 3.a.). *Second*, he alleges that MAJ Tran would only communicate with him at scheduled meetings—even though she met with female subordinates informally and at-will. *Id.* at 6. But these communication issues don't rise to the level of a tangible employment action. *See Isberner*, 2021 WL 4284540, at *22 (holding supervisor's misconduct constituted "unofficial acts" when it "included . . . failure to cooperate and meet with" the plaintiff-employee). Similarly, plaintiff alleges MAJ Tran commented with disapproval about the absence of female leadership—action (3)—and disparaged plaintiff's decisions when he was acting Chief—action (8). Doc. 52 at 5 (Pretrial Order ¶ 3.a.). But "offensive comments" likewise qualify as "unofficial acts of misconduct"—not official ones "aided by the agency relation." *Isberner*, 2021 WL 4284540, at *22. And such comments are a harm that a co-worker could inflict just as easily. They thus are not a tangible employment action. *Kramer*, 743 F.3d at 739.

So, the court's rulings easily dispense with all but one of plaintiff's allegations against MAJ Tran in the tangible employment action context. The only remaining alleged conduct—MAJ Tran's request that plaintiff change his title, action (7)—warrants a more detailed analysis. And—out of an abundance of caution—the court also conducts a detailed analysis of one other potential tangible employment action. Buried in plaintiff's facts section, one more argument for

a possible tangible employment action hides:  plaintiff's temporary reassignment during the internal investigation.  Doc. 61 at 4.  The court delves into these two remaining actions in turn, below.

### 1.    Change in Title

In late November 2018, just weeks after MAJ Tran assumed the Chief of Logistics title, she requested that plaintiff update his title to "Readiness Manager."  Doc. 52 at 2 (Pretrial Order ¶¶ 2.a.iii.–iv.).  This request, given the right circumstances, could qualify as a tangible employment action.

"A tangible employment action can include not just the obvious firing or demoting, but also giving an employee a less distinguished title or actions resulting in a material loss of benefits, [or] significantly diminished material responsibilities."  *Kramer*, 743 F.3d at 738 (quotation cleaned up).  But "neither a bruised ego nor a demotion *without* a concurring change in pay, benefits, duties, or prestige is enough."  *Id.* at 739 (emphasis in original) (quotation cleaned up).

Here, MAJ Tran's requested change in title didn't come with a material loss of benefits or diminished material responsibilities.  Nor did the change in title produce a concurring change in prestige.  This so because the requested title change aligned with several employer documents describing plaintiff's position.  For example, the Army's Position Description for plaintiff's job referred to it as the "Medical Logistics Readiness Manager for Irwin Army Community Hospital."  Doc. 54-11 at 3 (Def. Ex. 13).  Certainly, the Position Description also specifies that this "position serves as the Deputy Chief of Logistics in the absence of the Chief of Logistics."  *Id.*  But when MAJ Tran requested plaintiff remove the chief designation, she occupied the Chief of Logistics position.  It wasn't vacant.  So, this "Deputy Chief" title didn't apply then.

The Logistics Division organizational chart (shown above, § III.A.) confirms plaintiff's

title as "Readiness Mgt."  Doc. 54-7 at 1 (Def. Ex. 12).  As does the personnel roster (below).

| NAME | GRADE RANK | POSITION / DUTY TITLE | OFFICE LOCATION |
|---|---|---|---|
| **OFFICE OF THE CHIEF** | | | |
| **Tran, Tamara K.** | **MAJ** | **Chief, Logistics Division** | **IACH, RM 0H432** |
| Robenson LeGrand | SSG | NCOIC, Logistics Division | IACH, RM 0H431 |
| Paul Russell | GS-11 | Readiness Mgmt | IACH, RM |
| Silvia Duran | GS-11 | Systems Analyst (DMLSS) | IACH, RM |
| Marlene Cowens | GS-09 | Supply System Analyst | IACH, RM |
| VACANT | GS-06 | Secretary, Logistics Division | IACH, RM 0H430 |
| **EQUIPMENT MANAGEMENT BRANCH** | | | |
| **Scott Edgerton** | **W01** | **Chief, Equip Mgmt Branch** | **IACH, RM** |
| ON-CALL (Emergency) BES | Roster | Biomedical Equipment Specialist | IACH, RM |

Doc. 54-8 at 1 (Def. Ex. 10) (red outline added by the court).  Plaintiff declared during the

Army's internal investigation that the Army's TDA used "C, Readiness Manager"—presumably

with the "C" indicating chief.  Doc. 61-3 at 9 (Russell Decl. ¶ 35r).  But plaintiff offers no

evidence to support his contention the word "chief" properly preceded his title.  And the other

Army documents discussed—the position description, organizational chart, and roster—all

indicate that chief wasn't a part of his title.  What's more, plaintiff himself agreed that MAJ

Tran's request complied with the title set forth in the position description, the organizational

chart, and the employee lists.  Doc. 54-2 at 23 (Russell Dep. 60:10–21).  So, the undisputed

summary judgment facts demonstrate that the requested title change aligns with Army policy.

Plus, plaintiff conceded that no direct adverse employment action resulted from his title change.

Doc. 54-2 at 24 (Russell Dep. 61:17–23).  All these undisputed facts support a finding that no

reasonable jury could conclude that MAJ Tran's title-change request qualified as a tangible

employment action.

### 2.    Temporary Reassignment

Finally, plaintiff suggests that his temporary reassignment during the internal investigation also could qualify as a tangible employment action.  Doc. 61 at 4 ("Plaintiff was administratively suspended from his duties while the AR 15-6 Investigation was pending.  This was at the very least an 'adverse' result attributable to MAJ Tran's actions.").  Both plaintiff and MAJ Tran were "detailed out of the Logistics division" during the investigation.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.x.).  And plaintiff contends defendant suspending plaintiff from his duties during the investigation constitutes "at the very least an 'adverse' result."  Doc. 61 at 4.

*Kramer* is instructive to assessing a change in assignment or duties in the tangible employment action context.  743 F.3d 726.  There, the Tenth Circuit considered whether a court bailiff's full-time assignment to a particular task—the magnetometer—could qualify as a tangible employment action.  *Id.* at 744–45.  The plaintiff alleged that such an assignment hindered her advancement toward promotion.  *Id.*  That is, solely working the magnetometer precluded the possibility of "road experience," which was necessary for her desired promotion. *Id.*  Our Circuit explained that "requiring an employee to perform full time what may be a peripheral part of [his] job description, if it reduced the possibilities for advancement or otherwise had economic consequences, 'might constitute a tangible employment action.'"  *Id.* at 745 (quoting *Vance*, 570 U.S. at 437 n.9).  But, our Circuit concluded, the record in *Kramer* didn't support the relationship between road experience and promotion.  *Id.*

Also relevant to the court's analysis of the present action, a tie must exist between the alleged tangible employment action and the particular allegedly harassing supervisor.  *See Stapp v. Curry Cnty. Bd. of Cnty. Comm'rs*, 672 F. App'x 841, 848 (10th Cir. 2016) (concluding plaintiff didn't show a triable issue of a tangible employment action when plaintiff "cite[d] no

evidence to suggest any tie between the delay [in receipt of a pay raise] and any particular supervisor, let alone one with an ageist motivation.")

Here, defendant reassigned plaintiff to "Quality & Safety" after the EEO sensing session. Doc. 54-2 at 80 (Russell Dep. 163:13–17). COL Sexton determined that concerns expressed during the sensing session warranted an investigation into both MAJ Tran and plaintiff's workplace conduct. Doc. 52 at 2 (Pretrial Order ¶ 2.a.ix.); Doc. 54-2 at 85 (Russell Dep. 180:5–23). And so, both MAJ Tran and plaintiff were "detailed out of the Logistics division for the pendency of the investigation." Doc. 52 at 2 (Pretrial Order ¶ 2.a.x.). Defendant explicitly indicated—both in plaintiff's initial reassignment letter and its later extension-of-reassignment letter—that plaintiff's new detail was temporary. Doc. 54-24 (Def. Ex. 27) (notifying plaintiff of "temporary detail" to Department of Quality and Safety); Doc. 54-25 (Def. Ex. 28) (notifying plaintiff of extension of that "temporary detail"). Plaintiff's new duties in the Quality & Safety Department didn't change his pay, benefits, or compensation. Doc. 54-2 at 81 (Russell Dep. 165:9–18). That is, plaintiff identifies no economic consequences flowing from that temporary reassignment.

Nor has plaintiff shown that the temporary reassignment reduced his possibilities for advancement. Indeed, after the investigation, he returned to the same Readiness Management position he had occupied before reassignment. Doc. 54-2 at 82 (Russell Dep. 168:5–11). And he concedes that his Position Description "hadn't changed." *Id.* at 14 (Russell Dep. 32:10–11). Then, a few months later, he secured an advanced position—through application and interview— as Chief of Logistics elsewhere. *Id.* at 83 (Russell Dep. 174:10–22). The new position qualified as a promotion, complete with a jump in pay grade from GS 11 to GS 13. *Id.* at 84 (Russell Dep. 175:4–18).

And finally, MAJ Tran—the alleged harasser—didn't detail plaintiff out, but likewise experienced reassignment herself.  Doc. 52 at 2 (Pretrial Order ¶ 2.a.x.).  On these summary judgment facts, no reasonable jury could conclude that MAJ Tran executed a tangible employment action premised on plaintiff's temporary reassignment.

With no triable issue about a tangible employment action, defendant escapes strict vicarious liability and thus may invoke the *Faragher/Ellerth* defense.  The court thus turns to this affirmative defense, next.

### C.    *Faragher/Ellerth* Affirmative Defense

When "no tangible employment action has been taken against the employee as a result of the challenged harassment, an employer may assert the *Faragher/Ellerth* [defense] to escape vicarious liability for a supervisor's harassing conduct." *Macias v. Sw. Cheese Co.*, 181 F. Supp. 3d 883, 894 (D.N.M. 2016) (footnote omitted).  This affirmative defense has "two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Pinkerton v. Colo. Dep't of Trans.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (quotation cleaned up).  "These two elements are designed to encourage forethought by employers and saving action by objecting employees." *Stapp*, 672 F. App'x at 849 (internal quotation marks and citation omitted).  "The defendant bears the burden to prove both prongs of the defense by a preponderance of the evidence . . . [and] will lose this defense if it fails either prong." *Kramer*, 743 F.3d at 746 (internal quotation marks and citation omitted).

Thus, to "win summary judgment on the *Faragher/Ellerth* defense, an employer must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Id.* (quotation cleaned up).  That is, the "'defendant must demonstrate that

no disputed material fact exists regarding the affirmative defense asserted' when the evidence is viewed in the light most favorable to the plaintiff." *Id.* (quoting *Helm*, 656 F.3d at 1284). What's more, even on undisputed facts, "'the judgment call as to reasonableness is itself a jury issue unless no reasonable jury could decide it in the plaintiff's favor.'" *Id.* (quoting *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 34 (1st Cir. 2003)). Here, defendant fails to carry its burden on the second prong—that plaintiff unreasonably failed to take advantage of preventive or corrective opportunities. A reasonable jury could decide the second prong for plaintiff. So, the court denies defendant's summary judgment motion on the *Faragher/Ellerth* affirmative defense. And though this conclusion doesn't narrow the issue for trial, the court explains its reasoning, in detail, below.

### 1.    Reasonable Care

Reasonable care—the first element of the *Faragher/Ellerth* affirmative defense— "incorporates both preventive and corrective requirements." *Stapp*, 672 F. App'x at 849. The court addresses each one in turn.

### a.    Preventing Prohibited Harassment

An "employer acts reasonably as a matter of law to prevent harassment if it adopted valid anti-harassment policies and distributed those policies to employees via employee handbooks, even if it either provided no anti-harassment training or provided training only to managers." *Id.* at 849 (quotation cleaned up). And "distribution of a valid anti-harassment policy provides compelling proof that an employer exercised reasonable care in preventing . . . sexual harassment." *Anderson v. Wintco, Inc.*, 314 F. App'x 135, 139 (10th Cir. 2009) (quotation cleaned up).

Here, the undisputed summary judgment evidence demonstrates that the IACH Commander had adopted an anti-harassment policy that both informed employees of their

responsibility to report harassment concerns and told them how to do so. Doc. 54-18 at 1–2 (Def. Ex. 20) (identifying the location and phone number of the EEO office). What's more, the parties stipulate that plaintiff (and all fellow employees) completed annual anti-harassment training and No FEAR Act training. Doc. 52 at 2 (Pretrial Order ¶ 2.a.xi.). Also, the trainings specifically addressed sex discrimination, workplace harassment, and instructed employees to "promptly report" concerns through the "chain of command or a supervisor[.]" Doc. 54-21 at 23, 26, 27–29 (Def. Ex. 18); Doc. 54-22 at 23, 27–29, 34 (Def. Ex. 19). Plaintiff completed both these trainings in the years 2016, 2017, 2018, and 2019. Doc. 54-2 at 61–62 (Russell Dep. 125:19–126:14); Doc. 54-23 at 1–2 (Def. Ex. 21) (recording completion dates of plaintiff's online anti-harassment training for listed years).

On these undisputed summary judgment facts, no reasonable jury could find that defendant failed to satisfy the prevention prong of the two-part reasonable care analysis. The court thus moves on to the second part of this analysis: whether "the employer exercised reasonable care to . . . promptly correct any statutorily prohibited harassment." *Stapp*, 672 F. App'x at 849.

### b.    Correcting Prohibited Harassment

The second portion of the reasonable care analysis requires an employer to respond to any harassment in a manner "reasonably calculated to end the harassment and deter future harassers." *Kramer*, 743 F.3d at 747 (quotation cleaned up). *Pinkerton* is instructive when assessing this corrective prong. There, our Circuit affirmed a grant of summary judgment for the employer where the employer "immediately began [its] investigation" upon submission of the complaint and then "immediately removed" the alleged harasser as plaintiff's supervisor, even "before the investigation was complete[.]" *Pinkerton*, 563 F.3d at 1062. Elsewhere, our Circuit has held that the "'most significant immediate measure an employer can take in response to a

27

sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.'" *Christian v. AHS Tulsa Reg'l Med. Ctr., LLC*, 430 F. App'x 694, 698 (10th Cir. 2011) (quoting *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001)).

Here, COL Sexton responded to plaintiff's concerns in a variety of ways. *First*, he discussed concerns with MAJ Tran as they arose. Doc. 54-13 at 2 (Second Sexton Decl. ¶¶ 15–16) (explaining he counseled MAJ Tran to make complaints about plaintiff's decisions as acting Chief in private, not in front of other employees); Doc. 61-5 at 10 (First Sexton Decl.) (explaining he redirected MAJ Tran's selection of an interim chief for her maternity leave). *Second*, he initiated a meeting with Kathy Bellinder, the Equal Employment Manager. Doc. 54-13 at 4 (Second Sexton Decl. ¶ 32); Doc. 61-5 at 4 (First Sexton Decl.). The two worked together to address the issues by meeting with MAJ Tran for further discussion, Doc. 61-5 at 4 (First Sexton Decl.), and instituting the EEO sensing session, Doc. 54-15 at 5 (Bellinder Decl. ¶ 32). *Third*, COL Sexton ordered an AR 15-6 investigation into the allegations of misconduct by both plaintiff and MAJ Tran. Doc. 52 at 2 (Pretrial Order ¶ 2.a.ix.). These efforts were "reasonably calculated to end the harassment.[]" *Kramer*, 743 F.3d at 747. And defendant initiated an investigation, the "most significant immediate measure an employer can take[.]" *Christian*, 430 F. App'x at 698.

On these summary judgment facts, no reasonable jury could conclude that defendant failed to exercise reasonable care to correct harassment. And so, defendant has carried its burden on the first prong of this affirmative defense. The court thus turns to its second prong, where defendant's luck runs out, however.

### 2. Plaintiff-Employee Unreasonably Failed to Take Advantage of Preventive/Corrective Opportunities

Recall that a defendant invoking the *Faragher/Ellerth* affirmative defense also must show "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Pinkerton*, 563 F.3d at 1061 (quotation cleaned up). "An employer may satisfy the second element of the *Faragher/Ellerth* defense by showing that the victimized employee unreasonably delayed in reporting incidents of sexual harassment." *Helm*, 656 F.3d at 1291. In *Pinkerton*, our Circuit held that defendant had demonstrated plaintiff's failure when defendant "show[ed] a reporting delay of approximately two or two and a half months . . . for which [plaintiff] never offered any reason in her briefs on appeal." 563 F.3d at 1063; *see also Macias*, 181 F. Supp. 3d at 896 (collecting cases and concluding delay of "roughly five months after the commencement of the alleged harassment" untimely). That is, a plaintiff must make "'a concerted effort to inform the employer that a problem exists[.]'" *Pinkerton*, 563 F.3d at 1063 (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)).

Recall that, here, defendant's complaint procedure allowed for two forms of harassment reporting: filing an EEO complaint within 45 days or promptly reporting to a supervisor. Doc. 54-21 at 26 (Def. Ex. 18); Doc. 54-22 at 34 (Def. Ex. 19). And so, the court evaluates whether defendant has shown that no reasonable jury could find plaintiff took advantage of either reporting option, starting with the EEO complaint procedure.

### a.    EEO Complaint

The parties stipulate that plaintiff filed an EEO complaint on May 13, 2019. Doc. 52 at 3 (Pretrial Order ¶2.a.xiii.). But the alleged harassment started in November 2018, at the latest. *See* Doc. 54-2 at 27 (Russell Dep. 67:19–23) (identifying November 5 or 6 as date MAJ Tran conducted gender-segregated meetings); Doc. 52 at 2 (Pretrial Order ¶ 2.a.iv.) (identifying November 27, 2018, as date MAJ Tran requested plaintiff change his title). Doing the quick

math, six months passed between the commencement of the harassing behavior and plaintiff's EEO complaint. And six months is about three times as long as the delay held unreasonable in *Pinkerton*. 563 F.3d at 1063. Plaintiff's filing of the EEO complaint thus cannot demonstrate that he availed himself of defendant's preventive or corrective opportunities. This ruling reduces plaintiff's argument to his efforts to report MAJ Tran's alleged gender discrimination to a supervisor.

### b.    Supervisor Reporting

The only supervisor plaintiff claims to have spoken with about MAJ Tran is COL Sexton. Doc. 54-2 at 9 (Russell Dep. 26:9–14). And so, the court evaluates the plaintiff-Sexton conversations to discern whether a reasonable juror could find them to qualify as a concerted effort to report.

It is undisputed that plaintiff had conversations with COL Sexton—his second line supervisor—about MAJ Tran's gender-segregated meetings and communication shortcomings. It is also undisputed that plaintiff described this conduct to COL Sexton as "counterproductive" and "inappropriate." *Id.* at 92 (Russell Dep. 204:9–17). The question, then, is whether identifying MAJ Tran's conduct as such qualifies as a "concerted effort" to report harassment based on sex. *Pinkerton*, 563 F.3d at 1063.

The Tenth Circuit's unpublished ruling in *Stapp*, though not binding authority, proves helpful. 672 F. App'x at 849. There, a plaintiff-employee complained about "hostility in her department" to a personnel coordinator. *Id.* But she admitted in her deposition testimony that she couldn't recall reporting harassment on account of her age. *Id.* The district court granted summary judgment, ruling that defendant "establishe[d] the second element of the *Ellerth/Faragher* defense." *Id.* at 850. On appeal, plaintiff contended that "the district court incorrectly found that she had never reported age discrimination to [her supervisor.]" *Id.* at 849.

And she cited "portions of her affidavit where she recounted two general complaints of workplace hostility she made to [her supervisor]." *Id.* The Circuit affirmed the summary judgment based on the *Ellerth/Faragher* defense and concluded that the generalized complaints didn't suffice as "evidence [the plaintiff] complained of age-based harassment[,]" and that plaintiff's "failure to report age-based harassment . . . establishes the second element of the *Ellerth/Faragher* defense." *Id.* at 849, 850;[8] *see also Helm*, 656 F.3d at 1290 (holding under the corrective action prong that plaintiff's reports that her supervising judge had "done something inappropriate" and "made her feel uncomfortable" without any details or mention of sexual harassment didn't constitute adequate notice).

Contrast *Stapp* with *Isberner v. Walmart*, where our court concluded that whether a plaintiff's admittedly "vague" conversation about her sexual harassment concerns constituted reporting was a question properly left to the jury. 2021 WL 4284540, at *23. In *Isberner*, the plaintiff reported to a member of management various concerns about her market manager, including his: dislike of women in positions of power; treatment of female store managers; hostility and aggression toward her; and different treatment of her compared to his treatment of male employees. *Id.* Our court concluded that whether these relatively "vague" complaints

---

[8]    This generalized complaint ruling rings consistent with Tenth Circuit precedent in the retaliation context. To establish a retaliation claim, a plaintiff must demonstrate that she engaged in protected opposition to discrimination. *Macias v. Sw. Cheese Co.*, 624 F. App'x 628, 639 (10th Cir. 2015). And our Circuit has held that—although it doesn't require "magic words"—"[g]eneral complaints about company management . . . will not suffice." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). For example, a plaintiff—later alleging sexual harassment and retaliation—asked her employer for a shift transfer because her supervisor "was making her miserable and she was tired of him." *Macias*, 624 F. App'x at 639. The Circuit concluded plaintiff's generalized complaints didn't suffice as complaints about discrimination because "she never suggested he was discriminating against her, and she never explained how he was making her miserable[.]" *Id.* And so, plaintiff's complaints didn't qualify as "complaining about discrimination[.]" *Id.* *Stapp* embraces a similar approach to generalized complaints in the *Faragher/Ellerth* affirmative defense context. 672 F. App'x at 849–50.

sufficed as reporting depended on a credibility determination.  It thus denied summary judgment.
*Id.*

 Here, the summary judgment facts place plaintiff's efforts to report somewhere between *Stapp* and *Isberner*.  In his deposition, plaintiff first conceded that he didn't "specifically stat[e] there's a complaint" to COL Sexton.  Doc. 54-2 at 9 (Russell Dep. 26:16–20).  Later, plaintiff explained the conversation he had with COL Sexton in early November.  In that conversation, plaintiff focused on the communication difficulties between him and MAJ Tran:  "That conversation was there was a lack of communication between us.  There—it, it seems like the transition wasn't going well.  She doesn't have questions directly to me.  Other people come to me asking me questions.  You know, it seems like it's [a] telephone game."  *Id.* at 68 (Russell Dep. 133:4–9).  Plaintiff then described more generally subsequent conversations with COL Sexton, honing in once again on communication issues and counterproductivity:

> Q:  And then did you speak with Lieutenant Colonel Sexton again at a later time?
> A:  Oh, throughout November till March.
> Q:  Okay. So, let's talk about maybe the next time, and it doesn't have to necessarily be in chronological order, but I just need to hear about these conversations.
> A:  I talked to the conversation—I talked to the conversation about the different meetings, types of meetings, how I thought that would be—it's counterproductive, and things like that.  Then—
> Q:  And when you say the meetings, are you talking about the meetings that . . . she split the Logistics Division up into male and female?
> A:  Yes, the male and female, supervisors, so forth, so on.
> Q:  Okay, and what else—so, you told him at the time that you talked about those meetings that you thought the meetings were counterproductive?
> A:  The meetings were counterproductive, the lack of communication is counterproductive.
> Q:  Anything else that you said in related to those, those things?
> A:  The conversations were not lengthy but, you know, there were numerous ones. I couldn't tell you all the topics.

*Id.* at 68–69 (Russell Dep. 133:10–134:14).  Plaintiff's emphasis on counterproductivity and communication shortcomings parallel the "general complaints of workplace hostility" our Circuit

found insufficient as a report of discrimination in *Stapp*. 672 F. App'x at 849. But plaintiff's comments also included context about the gender-segregated meetings. Doc. 54-2 at 9 (Russell Dep. 26:16–20). This kind of context was missing from *Stapp*, where plaintiff never connected her generalized complaints of hostility to age. 672 F. App'x at 849–50. Indeed, this context tilts the scales toward *Isberner*, where plaintiff identified different treatment of men and women as part of her complaint, albeit in "vague" terms. *See* 2021 WL 4284540, at *23.

Plaintiff also contends that others could have perceived his comments as complaints of harassment, though he never used the words "harassing" or "discriminatory." Here, in context, is plaintiff's explanation:

> Q:  In your conversations with Lieutenant Colonel Sexton . . . [d]id you ever say that it was harassing?
> A:  I think the use of the word inappropriate would be, or counterproductive.
> Q:  Did you ever allege that her conduct or her actions was discriminatory?
> A:  It could be perceived as, yes.
> Q:  But did you ever make that allegation?
> A:  Yes, I would—yes.
> Q:  What did you say?
>  A:  I would—that, you know, I see it as a perception. Others—you know, if I were others or heard this they would perceive it that—you know, third party type stuff; but, but yes, I would say that it's definitely counterproductive and it, it could lead to harassment.
> . . .
> Q:  Did you tell Lieutenant Colonel Sexton that you found Major Tran's actions harassing?
> A:  Not in those words, no.
> Q:  Did you say that you found it discriminatory?
> A:  Not in those words.

Doc. 54-2 at 73–74 (Russell Dep. 142:15–143:21). Identifying behavior that another might perceive as *capable* of leading to harassment seems a far cry from making a "concerted effort" to report harassment. *Pinkerton*, 563 F.3d at 1063. But a reasonable jury could conclude that plaintiff's use of the word "inappropriate," coupled with the context of his complaints about the

gender-segregated meetings, gender-specific book assignments, and MAJ Tran's comments about no females in leadership, congealed to constitute a discrimination report.

Indeed, plaintiff answered in the affirmative when asked whether informing COL Sexton that MAJ Tran "was being . . . inappropriate and counterproductive" was his way of "describing the discrimination . . . against [him] based on [his] gender."  Doc. 54-2 at 92 (Russell Dep. 204:9–14).  And plaintiff testified that COL Sexton not only understood his complaints to be about sexual harassment, but directly confirmed as much.  *Id.* (Russell Dep. 204:9–24).  Piling on the side of the question favoring plaintiff, COL Sexton's declarations align with plaintiff's assertions.  COL Sexton identified plaintiff's complaints—about the gender-segregated book assignments and about MAJ Tran's observing there were few females in leadership—as a conversation that felt "like discrimination based on sex."  Doc. 61-5 at 4 (First Sexton Decl.).  COL Sexton also pinpointed plaintiff's complaints as one motivating factor for reaching out to Kathy Bellinder, the Equal Employment Manager.  Doc. 54-13 at 4 (Second Sexton Decl. ¶ 32); Doc. 54-15 at 1 (Bellinder Decl. ¶ 1); Doc. 61-5 at 4 (First Sexton Decl.).  COL Sexton thus drew a direct line between plaintiff's complaints and the work of the EEO.  And plaintiff's complaints, among other things, also figured in when COL Sexton decided to initiate an internal investigation.  Doc. 54-13 at 6 (Second Sexton Decl. ¶ 49).  A reasonable jury thus could conclude that COL Sexton deciding to contact Ms. Bellinder and initiate an investigation demonstrates plaintiff's complaints amounted to a report of harassment.

Drawing all inferences in the light most favorable to plaintiff—as it must—the court can't conclude as a matter of law that plaintiff unreasonably failed to take advantage of defendant's preventive or corrective opportunities.  A reasonable jury might find that plaintiff's conversations with COL Sexton, while not specifically employing the words harassment or

discrimination, nonetheless communicated as much—as confirmed by COL Sexton's response.

COL Sexton, as plaintiff's second-line supervisor, represented one of defendant's designated

opportunities for reporting. *See* Doc. 54-21 at 26 (Def. Ex. 18) (explaining that the army anti-

harassment training instructed employees to report harassment concerns to "a supervisor to

whom [the employee] fe[lt] comfortable reporting"); Doc. 54-22 at 34 (Def. Ex. 19) (same).

And so, a triable issue of fact persists over whether plaintiff took advantage of defendant's

preventive or corrective opportunities. In short, defendant fails to satisfy the second prong of the

*Faragher/Ellerth* affirmative defense. So, the court denies summary judgment based on that

affirmative defense.

But defendant's motion also tries another tack: the court should grant summary judgment

in favor of defendant because plaintiff cannot show a hostile work environment. Doc. 54 at 25.

The court evaluates this alternative basis for summary judgment, below.

## IV.        Hostile Work Environment

A "'plaintiff may establish a violation of Title VII by proving that discrimination based

on sex has created a hostile or abusive work environment.'" *Sanderson v. Wyo. Highway Patrol*,

976 F.3d 1164, 1174 (10th Cir. 2020) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th

Cir. 2005)). To survive summary judgment on a hostile work environment claim, "'a plaintiff

must show (1) that [he] was discriminated against because of [his] sex; and (2) that the

discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of

[his] employment and created an abusive working environment.'" *Id.* (quoting *Medina v. Income

Support Div., N.M.*, 413 F.3d 1131, 1134 (10th Cir. 2005)). That is, a plaintiff must adduce

sufficient facts at summary judgment to support a reasonable finding that "the workplace was

permeated with discriminatory intimidation, ridicule, and insult." *Kline v. Utah Anti-*

*Discrimination & Lab. Div.*, 418 F. App'x 774, 781 (10th Cir. 2011) (quotation cleaned up). A

plaintiff also must "show that the environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (quotation cleaned up). The court addresses each of plaintiff's requisite showings, below, starting with discrimination based on sex.

### A.    Sex-Based Discrimination

The first issue is whether plaintiff has presented facts from which a jury could infer that he suffered discrimination based on sex. To make such a showing, "a plaintiff may point to acts of harassment that are 'facially sex based'" as well as "facially sex-neutral conduct[.]" *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (quoting *Sanderson*, 976 F.3d at 1174). A plaintiff may rely on facially sex-neutral conduct when that conduct—"'viewed in the context of other, overtly gender-discriminatory conduct'" can "'support a finding of gender animus.'" *Id.* (quoting *Sanderson*, 976 F.3d at 1174). According to Tenth Circuit precedent, a plaintiff "can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment." *Chavez*, 397 F.3d at 833. And "it is ordinarily the province of the jury to decide whether facially sex-neutral conduct constitutes harassment based on sex." *Sanderson*, 976 F.3d at 1174.

Here, plaintiff identifies conduct that is both facially sex-based and facially sex-neutral. As previously outlined, *see* § III.B., plaintiff alleges that MAJ Tran engaged in ten offending actions. The first five are facially sex-based. MAJ Tran (1) conducted separate meetings for males and females; (2) assigned separate readings based on gender; (3) commented on the absence of female supervisors; (4) permitted spontaneous meetings with female employees but required male employees to make an appointment; and (5) attempted to designate a female as acting Chief while MAJ Tran went on maternity leave. Doc. 52 at 4–6. Based on this facially sex-based conduct, a reasonable factfinder could infer that MAJ Tran's facially sex-neutral

conduct also supports a finding of gender animus. That conduct includes MAJ Tran's (6) sparse communication with plaintiff during the transition period; (7) requiring plaintiff to remove the "Chief" designation from his Readiness Manager title; (8) allegedly disparaging statements about plaintiff's decisions as acting Chief; (9) email about door repair; and (10) request that plaintiff not remain on the logistics leadership emails. *Id.* at 4–6.

Construing all facts in plaintiff's favor, a reasonable jury could conclude that MAJ Tran discriminated against plaintiff based on his sex. Looking at MAJ Tran's choice to separate genders for the transition meetings and book assignments, as well as apparent preferential treatment of women for spontaneous access to her time, a reasonable jury could find these distinctions were drawn on the basis of sex. And, if a jury so concluded, then the sex-neutral conduct could shore up a finding of gender animus.

But even when the court assumes that the first five listed allegations show MAJ Tran's conduct was based on sex—and even when the court accounts for the possibility that a jury could infer MAJ Tran's facially sex-neutral conduct contributed to that discrimination—it still isn't enough.[9] Plaintiff also must show that a reasonable jury could find that discrimination "sufficiently severe or pervasive such that it altered the terms or conditions of his employment

---

[9]    Plaintiff's Response directs the court to the internal investigation's conclusions. Doc. 61 at 11 ("[T]he agency itself previously found Plaintiff was indeed subjected to gender discrimination and a hostile work environment[.]"). Plaintiff's right. The internal investigation determined that MAJ Tran "discriminated on the basis of gender." Doc. 61-4 at 8 (Pl. Ex. D). The internal investigation also found that MAJ Tran "contributed to a hostile working environment." *Id.* at 5. But plaintiff directs the court to no place in the investigation report that assesses the severity or pervasiveness of that hostile work environment—an analysis required by the governing law. As defendant argues, the "AR 15-6 investigation is conducted under different standards, for different reasons, limited to agency use, and it is not a determination whether Plaintiff satisfied the elements of a hostile work environment under Federal law." Doc. 65 at 10 (citing *Vaughan v. Ky. Army Nat'l Guard*, No. CIV.A. 12-35-DCR, 2013 WL 211075, at *4 (E.D. Ky. Jan. 18, 2013) (explaining the regulations for an AR 15-6 investigation)); *see also Timmons v. White*, 314 F.3d 1229, 1233 (10th Cir. 2003) (holding employment civil action receives de novo review in district court). And so, the court cannot adopt, whole hog, the conclusions of the internal investigation, as plaintiff seems to suggest. *See* Doc. 61 at 13.

and created an abusive working environment." *Sanderson*, 976 F.3d at 1174. The court therefore turns to the second showing a hostile work environment plaintiff must make, next.

But first, recall that plaintiff must "show that the environment was both objectively and subjectively hostile or abusive." *Morris*, 666 F.3d at 664 (quotation cleaned up). For purposes of this Order, the court assumes plaintiff subjectively experienced the environment as hostile or abusive. The court thus focuses its severe or pervasive analysis solely on the objective prong.

### B.      Sufficiently Severe or Pervasive

"Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Throupe*, 988 F.3d at 1252. To make the severity or pervasiveness determination, a court must evaluate the totality of the circumstances. *Id.* The court must "'consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Morris*, 666 F.3d at 664). A plaintiff doesn't demonstrate a sufficiently pervasive or severe hostile work environment with "a few isolated incidents" unless those "isolated incidents are in themselves 'severe.'" *Morris*, 666 F.3d at 666. "[W]hether the conduct was severe or pervasive is typically a question for the jury," but a grant of summary judgment is appropriate when "the plaintiff fails to make a severe or pervasiveness showing." *Throupe*, 988 F.3d at 1252. The court first examines whether a reasonable jury could conclude that plaintiff experienced severe harassment.

### 1.      Severity in the Case Law

Our Circuit has found "conduct sufficiently severe to overcome summary judgment in only particularly threatening or humiliating circumstances." *Id.* at 1255. *Throupe* is instructive here. 988 F.3d 1243. There, plaintiff was an associate professor of Real Estate at the University of Denver when he developed a close personal and professional relationship with a female

graduate student from China. *Id.* at 1248. According to plaintiff, his superiors spread rumors about his relationship with this student; required him to undergo a Title IX investigation; issued a written warning instructing him not to interact with this student or others in a similar manner; assigned him an unfavorable teaching schedule with less desirable class assignments; and yelled at him once during a scheduled meeting. *Id.* at 1253. Our Circuit considered, among other things, whether the district court properly had granted summary judgment against the professor's hostile work environment claim. In a nutshell, the district court reasoned that no reasonable jury could find the alleged treatment severe or pervasive to support a hostile work environment claim. *Id.* at 1255. Our Circuit recognized that the defendants' actions likely were "personally painful" for plaintiff. *Id.* Nonetheless, it agreed with the district court that the conduct didn't rise to the level of severity required for a hostile work environment claim because it was neither threatening nor humiliating. *Id.* And it affirmed the district court's grant of summary judgment for defendants.

Our Circuit has affirmed other rulings granting summary judgment, concluding plaintiff's evidence inadequate to present a triable issue on the severe or pervasive requirement. Take *Morris*, for example. There, a registered nurse alleged that a surgeon flicked her on the head twice and threw pericardium tissue at her during a surgical procedure—soaking her scrubs with blood and bodily fluids. 666 F.3d at 665. He also generally yelled at her and demeaned her work with comments like "get your ass in gear" or "get someone in here who knows what they are doing." *Id.* at 665–66. But our Circuit affirmed summary judgment against the nurse's hostile work environment claim, holding that these isolated incidents didn't rise to a sufficient level of severity to support a hostile work environment claim because they "could not reasonably be viewed as threatening or severe." *Id.* at 668. It also concluded that the surgeon's "'slurs'"

didn't rise to the "'steady barrage of opprobrious . . . comments'" necessary to survive summary judgment. *Id.* at 666 (quoting *Chavez*, 397 F.3d at 832). And our Circuit has emphasized the importance of context in assessing severity. It couldn't "ignore the surgical context in which [the pericardium tissue] incident occurred[.]" *Id.* at 668. Because employees in that context regularly saw "human tissue, blood, and other bodily fluids," any perceived severe threat from the tissue necessarily diminished in the surgical context. *Id.*; *see also Pfannenstiel v. Kansas*, No. 21-CV-04006-HLT, 2023 WL 4623848, at *15 (D. Kan. July 19, 2023) (applying *Morris* to hold that individuals wearing weapons in the context of working at the Kansas Highway Patrol wasn't unusual and didn't enhance harassment's severity), *aff'd*, No. 23-3145, 2024 WL 3534142 (10th Cir. July 25, 2024).

By contrast, the Tenth Circuit has held the hostile work environment in *Sanderson* sufficiently severe and pervasive to preclude summary judgment. 976 F.3d at 1177. There, a female employee of the Wyoming Highway Patrol "was subjected to persistent, repeated rumors of sexual promiscuity . . . [that] characterized [her] as having a sexual relationship with colleagues and various supervisors[.]" *Id.* Those colleagues "speculated that she used sex to gain advantages, including securing her [employment] position[.]" *Id.* She endured collocations like the "division bicycle" and faced rumors that she "used sex to obtain a new patrol car." *Id.* at 1174. Holding the hostile environment sufficiently severe and pervasive, our Circuit emphasized that the "rumors were circulated by *multiple* colleagues; they *were not isolated comments made by a particular supervisor*[.]" *Id.* (emphasis added). Finally—in two other cases—our Circuit has determined one instance of sexual assault—even when singular and isolated— is so "especially egregious or extreme" that it "could be objectively viewed as threatening and severe." *Morris*, 666 F.3d at 667 (first citing *Turnbull v. Topeka State Hospital*, 255 F.3d 1238

(10th Cir. 2001); and then citing *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998)). The insufficiently severe conduct in *Throupe* and *Morris* and the sufficiently severe conduct in *Sanderson*, *Turnbull*, and *Lockard* allow the court to extrapolate a severity continuum. The court locates defendant's conduct here on that continuum, below.

### 2.    Severity Analysis

Here, plaintiff's grievances were neither physically threatening nor humiliating. *Throupe*, 988 F.3d at 1252. Indeed, much of MAJ Tran's offending conduct mirrors that in *Throupe*. He complains, for example, of unfavorable treatment in having to schedule meetings with MAJ Tran when female employees could walk right in to the Major's office and convene a meeting. Doc. 54-2 at 36 (Russell Dep. 86:16–22). This aligns most closely on the severity continuum with the unfavorable teaching schedule and less desirable class assignments held insufficiently severe to survive summary judgment in *Throupe*. 988 F.3d at 1255. Plaintiff also complains of the requests to change his title and remain off leadership emails. Doc. 52 at 2 (Pretrial Order ¶¶ 2.a.iv., viii.); Doc. 54-2 at 26–27 (Russell Dep. 66:21–67:7). Again, these grievances parallel *Throupe*, where plaintiff's department head had doled out a written warning—a perceived slight with few, if any, real world consequences. 988 F.3d at 1255. The particular context of MAJ Tran's requests matters, too. *Morris*, 666 F.3d at 666. The employment context here is hierarchical. Individuals address one another by rank—like Major or Colonel—for example. MAJ Tran's request for a title change and shift in email privileges comported with the established hierarchy and plaintiff's place in it. Like the surgical context in *Morris*, the hierarchical context here thus tempers the severity of MAJ Tran's requests.

Nor were plaintiff's complaints centered on MAJ Tran's communications sufficiently severe. MAJ Tran's comments about the dearth of female leadership were, at most, "mere offensive utterance[s]," which didn't rise to the "steady barrage of opprobrious . . . comments"

necessary to survive a summary judgment motion. *Morris*, 666 F.3d at 664, 666 (citation and internal quotation marks omitted). MAJ Tran's overly inclusive door repair email, at most, weighs in at a "mere offensive utterance,"—candidly, the court would place this email incident in a much lighter weight class than that. And, finally, MAJ Tran's alleged disparagement of plaintiff's decisions when he was acting Chief suffer a similar fate. The severity of such disparagement more clearly lines up with the rumors countenanced by the plaintiff in *Throupe*— personally painful—than the rumors described in *Sanderson*—humiliating references to the "division's bicycle" and trading sex for a patrol car. *Throupe*, 988 F.3d at 1255; *Sanderson*, 976 F.3d at 1174.

It is also worth noting that most of the facially sex-based conduct—the gender segregated meetings and reading assignments, along with the comment about an absence of female leadership—all occurred at once, on a single day. The Circuit has clarified that, if a plaintiff hopes to rely on "a few isolated incidents" they must qualify as "in themselves 'severe.'" *Morris*, 666 F.3d at 666. But one's exclusion from a singular, female employees only meeting, and the requirement that men read a different book than women—while hardly ideal—doesn't belong in the same cohort as an instance of sexual assault. These isolated incidents provide little heft to plaintiff's severity showing.

Putting the nail in the coffin, any severity potentially found in MAJ Tran's other facially sex-based conduct—MAJ Tran's resistance to walk-in meetings with male employees or her desire to designate a woman as acting Chief—is tempered by the summary judgment facts. To be sure, plaintiff identified two or three occasions where he was required to schedule a meeting with MAJ Tran. Doc. 54-2 at 40, 41 (Russell Dep. 90:3–19, 91:4–6). And he witnessed several times when female subordinates just walked right in to the Major's office and convened an

unscheduled meeting. *Id.* at 36 (Russell Dep. 86:16–22). But plaintiff also testified that there were times where he, too, engaged in spontaneous meetings with MAJ Tran. *Id.* at 38–39 (Russell Dep. 88:19–89:21). And he indicated that after the two or three unsuccessful attempts, he eventually stopped trying to pop into the office to conduct an unscheduled meeting. *Id.* at 40, 41 (Russell Dep. 90:3–19, 91:4–6). Both facts temper the severity of any gender-based difference in treatment over unscheduled meetings. Similarly, while MAJ Tran would have liked to appoint a female acting Chief, COL Sexton intervened and didn't permit her to do so. Doc. 61-5 at 10 (First Sexton Decl.). And in the end, she appointed a male employee as acting Chief. Doc. 54-13 at 4 (Second Sexton Decl. ¶ 30). This ultimate outcome tempers any severity that might otherwise have inhered in MAJ Tran's alleged gender-based preference.

These summary judgment facts, evaluated under Tenth Circuit precedent, wouldn't allow a reasonable jury to conclude that plaintiff experienced severe harassment. Even taken in their totality, they land on the *Throupe* and *Morris* end of the severity spectrum.

But this conclusion doesn't end the analysis. The Supreme Court has made it clear—a hostile work environment that *either* is severe *or* pervasive can support a triable Title VII claim for sex discrimination. *See Morris*, 666 F.3d at 665 ("The Supreme Court has repeatedly said, using the disjunctive 'or,' that a claim of discrimination based on the infliction of a hostile working environment exists if the conduct is 'severe or pervasive.'" (quotation cleaned up)). And so, the court also must assess whether a reasonable jury could find plaintiff here experienced pervasive harassment as well. That's up next.

### 3. Pervasiveness in the Case Law

The problematic conduct plaintiff has adduced also doesn't raise a triable issue of pervasiveness. According to our Circuit, "a few isolated incidents" of discriminatory conduct doesn't make harassment pervasive. *Id.* at 666. Instead, a pervasively hostile environment is

"*polluted* with gender-specific comments and behavior," *id.* (emphasis in original) (quotation cleaned up), and "*permeated* with discriminatory intimidation, ridicule, and insult," *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1228 (10th Cir. 2022) (emphasis added) (quotation cleaned up).  Courts assess pervasiveness by looking at the number of offending incidents as compared to the length of time over which they occurred.  *See, e.g.*, *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (holding "five separate incidents . . . over a span of approximately sixteen months" not sufficiently severe or pervasive to survive summary judgment); *Chavez*, 397 F.3d at 833 (identifying that plaintiffs had endured "a number of gender-based incidents" over a long period of time); *Morris*, 666 F.3d at 665, 669 (noting the incidents alleged by plaintiff were "relatively isolated" when compared with plaintiff's "otherwise uneventful tenure" on the heart team).  Assessing pervasiveness also requires the court to consider the extent to which the offending behavior spread.  *See Sanderson*, 976 F.3d at 1177 (contrasting "isolated comments made by a particular supervisor" with "rumors circulated by multiple colleagues" to conclude a jury could find severe or pervasive harassment); *see also Frank v. Heartland Rehab. Hosp., LLC*, No. 20-CV-2496-HLT-KGG, 2022 WL 486793, at *5 (D. Kan. Feb. 17, 2022) (citing *Sanderson* and holding that allegedly harassing "behavior by a single employee . . . pales in comparison" to "humiliating rumors by multiple colleagues in multiple divisions"), *aff'd*, No. 22-3031, 2023 WL 4444655 (10th Cir. July 11, 2023).

*Ford v. Jackson National Life Insurance* provides further direction for the court's pervasiveness analysis.  45 F.4th 1202.  There, male co-workers repeatedly asked plaintiff sexually explicit questions and made sexist remarks "on a daily basis with impunity."  *Id.* at 1230.  Other female employees confirmed the constant nature of degrading "sexual banter."  *Id.* Indeed, sexually explicit conversations occurred so frequently that "one employee said, 'it would

be easier to list the employees who didn't participate than the ones who did.'" *Id.* (quotation cleaned up). Our Circuit held that, on these facts, "a reasonable jury could find that [defendant] maintained a work environment that was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Id.* (internal quotation marks and citation omitted). Guided by these cases, the court examines whether a reasonable jury could find that plaintiff experienced pervasive harassment.

### 4.    Pervasiveness Analysis

Construing all facts in plaintiff's favor here, the court identified ten MAJ Tran incidents, recited above, *see* § 4.A. Those incidents occurred over eight months from August 2018 (when MAJ Tran arrived to begin transitioning into the Chief role) to March 2019 (when both MAJ Tran and plaintiff were detailed out of the Logistics division for the internal investigation). Doc. 52 at 2 (Pretrial Order ¶¶ 2.a.iii., x.); Doc. 54-24 (Def. Ex. 27) (identifying March 26, 2019, as the effective date of plaintiff's temporary detail). But the raw numbers don't tell the whole story. The gender segregated meetings, gender segregated reading assignments, and the absence of female leadership comment all occurred at one time. And that one incident was an isolated one—not ongoing or recurring. Piling on, even the facially sex-based conduct that appears ongoing or recurring doesn't look that way after a closer look under the hood. As already explained, plaintiff's inability to access MAJ Tran by unscheduled meeting only happened a few times before plaintiff quit trying. And there were other times when he had access to MAJ Tran, unfettered by calendaring requirements.

Similarly, the facially sex-neutral conduct consists primarily of one-off isolated incidents (removing chief from plaintiff's title, emailing about door repair, requesting plaintiff's exclusion from leadership emails, attempting to designate a woman as acting chief). These one-off events—even taken together, as the totality of the circumstances analysis requires—don't reveal

the kind of repeated, constant, frequent behavior that our Circuit found pervasive in *Ford*.  45 F.4th at 1230–31.  Nor do plaintiff's communication complaints create a permeated, polluted environment.  Plaintiff complains of MAJ Tran's sparse communications with him during the transition period.  But the very definition of a transition period inherently limits the ongoing nature of the alleged sparse communications.  Plaintiff also complains about MAJ Tran's allegedly disparaging statements about plaintiff's work while he was acting Chief.  The case law suggests MAJ Tran's allegedly disparaging comments don't suffice for a reasonable juror to find IACH's environment "'*permeated* with discriminatory intimidation, ridicule, and insult.'"  *Id.* at 1228 (emphasis added) (quoting *Throupe*, 988 F.3d at 1252 ).  MAJ Tran's comments were "isolated comments made by a particular supervisor" instead of "rumors circulated by multiple colleagues"—a distinction our Circuit deemed significant to the pervasiveness analysis in *Sanderson*.  976 F.3d at 1177.

The court is mindful that it mustn't snatch a jury question out of the jury's hands.  And the court acknowledges that determining severity or pervasiveness often rests with the jury.  *See id.* at 1176 ("The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." (quotation cleaned up)).  This language might make some believe that summary judgment on a severity or pervasiveness analysis is almost never appropriate.  But the cases tell a different story.  Our Circuit often has affirmed summary judgment premised on insufficient severity or pervasiveness, as the cases surveyed above demonstrate.  The court here strives to follow and apply the contours of those summary judgment rulings.  Heeding that guidance, the court extrapolates a severity and pervasiveness continuum.  That is, looking at a composite of a plaintiff's allegations, the court divides the (relatively speaking) innocuous work environments—think *Throupe* and *Morris*—

46

from those more nefarious—think *Sanderson* and *Ford*. When the court does so here, plaintiff's allegations belong with the cases where our Circuit affirmed summary judgment.

That's not to say the work environment didn't prove personally difficult for plaintiff. It well may have. But not "all offensive or hurtful conduct within the workplace is actionable under Title VII[.]" *Throupe*, 988 F.3d at 1255. Even drawing all inferences from the summary judgment evidence in plaintiff's favor, the court concludes plaintiff has failed to make a showing sufficient to survive summary judgment on this claim. That is, plaintiff didn't come forward with evidence of sexual harassment sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. The court thus grants summary judgment to defendant on plaintiff's one surviving claim. Having granted summary judgment, the court needn't reach the merits of defendant's argument that failure to exhaust precludes plaintiff's damages. Doc. 54 at 37–38.

## V.        Request for Oral Argument (Doc. 61)

Finally, the court denies as moot plaintiff's request for an oral argument. *See* Doc. 61 at 11–14. Plaintiff had an opportunity to present his arguments in his papers, and so no oral argument is required. *Barrett-Taylor v. Birch Care Cmty., LLC*, No. 22-1013, 2023 WL 2823531, at *3 (10th Cir. Apr. 7, 2023) ("A formal evidentiary hearing with oral argument is not necessarily required. Rather, the parties' right to be heard may be fulfilled by the court's review of the briefs and supporting affidavits and materials submitted to the court." (quotation cleaned up)). Our local rules clarify that whether to hear oral argument lies in the discretion of the court. *See* D. Kan. Rule 7.2 ("The court *may* set any motion for oral argument or hearing at the request of a party or on its own initiative." (emphasis added)). And so, in light of this Order's grant of summary judgment, the court denies as moot plaintiff's request for oral argument.

## VI.        Conclusion

The court denies summary judgment in defendant's favor on the *Faragher/Ellerth* affirmative defense.  Defendant failed to establish under the summary judgment standard that plaintiff unreasonably failed to take advantage of defendant's preventive/corrective opportunities.  A reasonable jury could conclude that plaintiff reported the alleged discrimination based on gender to COL Sexton.  But the court grants defendant summary judgment against plaintiff's hostile work environment claim.  No reasonable jury could find severe or pervasive harassment on the summary judgment facts here.  The court thus directs the Clerk to enter Judgment in accordance with this Memorandum and Order and close this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 53) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff's request for an oral hearing (Doc. 61) is denied as moot.

**IT IS SO ORDERED.**

**Dated this 7th day of November, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**